73 So.2d 717

**UNDERWOOD et al.   v.   SMITH.**

**5 Div. 572.**

Supreme Court of Alabama.

June 24, 1954.

Wilbanks & Wilbanks, Alexander City, for appellee.

Sam W. Oliver, Dadeville, Steiner, Crum & Baker Montgomery, for appellants.

PER CURIAM.

This is an action by Mrs. Elizabeth Smith against T. L. Underwood and Frances S. Underwood for damages alleged to have resulted from an automobile collision between a car in which Mrs. Smith was riding and one owned by T. L. Underwood, and being driven by his wife Frances S. Underwood. The action in the trial court resulted in a verdict and judgment for Mrs. Smith, from which the defendants have appealed to this Court.

The collision occurred about dusk on July 22, 1951, just south of Alexander City, Alabama, on the Columbus, Georgia, highway, being U. S. 241. Mrs. Smith's son-in-law was driving the car in which she was riding and she was sitting on the right hand side of the back seat.

According to Mrs. Smith's testimony she had been in good health prior to the accident. After the accident she was carried to the Russell Hospital in Alexander City, where she was treated for lacerations, bruises, etc., and a number of stitches were taken in a cut on her head. She complained of chest injuries and leg injuries. As a consequence x-rays were made of her chest but no serious injuries were found. No x-ray was made of her leg as she did not complain of any injury then. Mrs. Smith stayed in the Alexander City hospital from Sunday night until Wednesday morning. At that time she was discharged, not as cured but in order that she might accompany her daughter who was also injured in the same accident and who was being carried to Birmingham for treatment by a brain specialist. In Birmingham Mrs. Smith stayed in the home of her son for approximately four weeks, and according to the testimony was completely bedridden the entire time. While in Birmingham she was treated by one and possibly two doctors and had further x-rays made.

After remaining in Birmingham about four weeks Mrs. Smith went to Columbus, Georgia, to stay with the daughter who had been in the collision, and while in Columbus Mrs. Smith was treated by a doctor in an attempt "to build up her system".

On October 16, 1951, almost three months after the automobile collision and while Mrs. Smith was in Columbus, she was walking across a room in an effort to assist her daughter and, according to her testimony, for no apparent reason her leg gave way and she fell and broke her hip.

With respect to her condition between July 22, 1951, when she had the automobile accident, and October 16, 1951, when she fell, Mrs. Smith's testimony is in substance that, prior to the accident she could walk all right, and afterwards she could walk just a little. She was not able to do house work; that she did not sleep well, "was too nervous and shocked * * *, would drop off to sleep but would have nightmares" and the same thing occurred night after night. Before the accident she was alert for her age, helped keep house and walked where she wanted to. She took nerve medicine and it seemed like everything was in a dream. When she went to Columbus she had the same trouble and a doctor there gave her some treatment, "but he couldn't get me built up, he couldn't do anything", and finally she fell while in that weakened condition which had continued up to that time. Her pains and discomfort were in her head, left leg and left side. When she fell on October 16, 1951, she broke her left hip.

Dr. Askin testified as follows:

"The hospital called me to the emergency room of the hospital due to a wreck in which a number of people were injured. I was among the doctors called. I was the last to get in and the others were being worked on, and Mrs. Smith was lying on a stretcher. She had a head injury with swelling and a cut, which was sewed up with black silk. She had complaints of chest pain

and aching which would be comparable to anybody that had been badly bruised or been in a wreck or anything like that. She was admitted to the hospital, she was examined in the emergency room and her head was sewn up and she was admitted to the hospital. The next morning we had chest x-rays made of her chest and it did not show any fracture or serious injury to the bones of the chest. Mrs. Smith stayed in the hospital from Sunday night, July 22d until Wednesday morning, July 25th when she left in an ambulance with her daughter, I believe it was.

"Q. What treatment did you give her while you were there—while she was in your charge? A. Simply first aid treatment consisting of cleaning off of the wound and sewing it up and then keeping her in bed, the administration of hypos for pain relief. When she said she was hurting, they gave her hypodermics. It was more or less a matter of keeping her off her feet for observation, to see how she was doing. * * *

"What do you remember you did, Dr. Askin? A. Just sewing up her head and getting an x-ray and keeping her comfortable. I don't remember any other procedure that was carried out. * * *

"Q. State whether or not Mrs. Smith had any evidence of a brain injury? A. I would say yes, the wreck and the shaking up, the unconsciousness, the blow and swelling of the head and the cut on the head, I think all would mean she had to *have some mild concussion.* * * *

"The court: I think that objection is good. What is possible is far beyond the realm, even of speculation. A. Could I put it this way? The result of a brain injury *frequently gives atrophic disturbance by cutting down on the amount of blood supply to the bone, giving a weakness of the bone.* This is a frequent result of head injuries. I cannot state that it applies to Mrs. Smith.

* * * *It was the area she was complaining of.*

"Q. What did your x-ray examination reveal of the area that she was complaining of? A. The x-ray of the chest *revealed no evidence of fracture of any chest cavity bones, the ribs* and so forth.

"Q. Doctor, would it be a fair statement to state that your x-ray study was entirely negative? A. Grossly, yes. She showed some evidence of fibrosis, which is not infrequent in an old person.

"Q. That is a condition due to age? A. Yes, not due to accident.

"Q. So the x-ray study that you made showed that she was suffering *from old fibrosis due to age and not to injury?* A. That is correct.

"Q. Doctor, would you mind explaining to us just what fibrosis is? A. To simplify, it is simply *a scarring, it is a replacement of normal tissue with* scar tissue, fibrous tissue. It is the result of *any old irritation, simply over use. It is not a serious disease* or anything like that. It is simply scarring of tissue.

"Q. Is it due also to advanced age? A. Age can play a part in it, yes, sir. Most of us have some fibrosis as we get older because of some insult to the lung from over exertion, exercise or colds.

"Q. So that your x-ray study revealed a condition that was due to *old age and not to the accident* and revealed nothing of any injury connected with an accident? A. That is correct. * * *

"Q. And you continued to see her at intervals until her discharge or when? A. July 25, Wednesday morning. I did not see her on July 25. I saw her last on the night of July 24.

"Q. Now, doctor, up to that time, had she made any complaint to you at all of any injuries to her *lower extrem-*

*ities, hips, or anywhere in that region?* A. *Not enough to be considered anything other than the usual soreness following an automobile wreck. Not enough to warrant extensive studies of those regions.*

"Q. You don't recall any objective evidence, such as bruises or anything other than on the chest and the wound on the scalp, do you, doctor? A. No, except that in the report that you just showed me, it stated she had multiple contusions. Those are bruises where the skin is not broken but has discoloration. * * *

"Q. Now, doctor, in your practice, you have occasion to encounter many times the problem, and it is a medical problem, of *ladies of advanced age falling and breaking their hip, do you not?* A. *Yes, sir.*

"Q. That happens, we might say, every day without any automobile accident, without any injury or anything else. Isn't that a fair statement? A. It happens somewhere everyday, but not that often in my practice.

"Q. But it is one of the most frequent occurrences and one of the most serious problems with the medical profession? A. It is a serious problem and it does occur.

"Q. There is nothing unusual about a *lady seventy years old falling and breaking a hip?* A. No, sir.

"Q. And in the vast majority of those cases, you don't find any history of trauma at all? A. That is true.

"Q. You might even say it is a natural occurrence of old age, that it does happen and happens often? A. *Yes, sir, I think I would say that other factors may be present, but that this occurs without any other factors.*

"Q. And in a vast majority of the cases it does occur without any other factor? A. That's right.

"Q. I believe that is all. * * *

"Mr. Baker: I want to get straight who is testifying in this case. Me or Mr. Wilbanks. A. As a matter of opinion, I believe that a person with an injury as you describe would have more probability of having trouble. It could occur without it, but I think the additional fact of injury there, I think there would be more chance of having trouble."

Dr. Banks was appointed by the court to examine plaintiff shortly before the trial. He testified as to her then condition, not necessary here to rehearse. His qualification as an expert was admitted. He was asked by counsel for plaintiff the following hypothetical question:

"Dr. Banks, assuming that Mrs. Elizabeth Smith at the age of sixty-nine years, in good health, was in an automobile accident on July 22, 1951 in which she was severely jolted, bruised, rendered unconscious, complained of pain, and continues to suffer pains in hers legs, dizzy spells, frequent headaches, nightmares, and suffered progressive loss of agility to her lower limb, and assuming further that that condition continued to October 16, 1951 and that while walking from her bed across a living room floor her leg, her hip, her side gave way and for no apparent reason other than just walking across the living room floor, in your opinion, was the fall and broken hip the probable result?"

And the following occurred:

"The court: The proximate result. The nearest result. Go on.

"Q. The probable or proximate result?

"Mr. Baker: I would like to know first if the doctor has an opinion.

"Q. All those facts, if true, do you have an opinion? A. They have been growing progressively worse?

"Mr. Baker: We would like to know first if the doctor has an opinion. A. I want a little more elucidation.

"Mr. Oliver: We want an objection to that question.

"The court: And the objection is overruled.

"Mr. Oliver: We except.

"The court: Now, elucidate. A. The loss of agility was growing progressively worse from the date of the accident?

"Q. Yes. A. In that case, *I would say probably it was the result.*

"Mr. Oliver: We move to exclude that.

"The court: Overruled. Do you mean probable and proximate result, doctor? A. Yes.

"Mr. Oliver: We move to exclude it.

"The court: Motion to exclude is overruled.

"Mr. Oliver: We except."

Plaintiff testified as to the occasion of her fall in Columbus on October 16, 1951: "I was lying down and I heard my daughter in there in the other room like she wasn't doing well, you know how she is, so I got up and was walking, which I had been weak in that leg, I got up and walked across the room and just gave way and I fell. I fell on that side right in the floor and my hip broke."

One of the serious questions in the case is the admissibility and effect of that evidence on the question of damages. Liability for the damages and injury proximately caused by the accident is assumed on this question. It is not seriously controverted but that liability was a jury question.

There are two questions in respect to the accident of October 16th. One is whether it is sufficiently claimed in the complaint. The other is whether the pain and suffering and expense caused by that fall is a proximate result of the accident which occurred July 22, 1951, about three months prior to the fall. The last inquiry will be considered first.

To reach a correct conclusion, we find it involves two principles as discussed by the authorities. One applies where the subsequent occurrence is a mere aggravation of injuries already received as a direct result of the primary accident, so that its recovery is retarded by some accident or incident, not resulting from the failure of the injured person to use ordinary care. Under that principle if the second injury is found to be a sequence or natural result likely to flow from the original injury, the wrongdoer is held liable for the entire damage; but if the subsequent event is considered as attributable to a distinct intervening cause, the wrongdoer is held to be liable only for the original injury. This theory is analyzed in 9 A.L.R., pp. 255, et seq., and in 20 A.L.R. 524. The other principle is treated in 76 A.L.R. 1285, and applies where the subsequent accident was distinct from the original injury. See, also, 25 C.J.S., Damages, § 20, page 476, notes 82–86. At least that theory is advanced in the two annotations. But both annotations cite and rely on some of the same cases, and are subject to the same broad principle. Those cases are Snow v. New York, N. H. & H. R. Co., 185 Mass. 321, 70 N.E. 205; Raymond v. City of Haverhill, 168 Mass. 382, 47 N.E. 101. Other cases are Hartnett v. Tripp, 231 Mass. 382, 121 N.E. 17; Sporna v. Kalina, 184 Minn. 89, 237 N.W. 841, 76 A.L.R. 1280; Daniels v. New York, N. H. & H. R. Co., 183 Mass. 393, 67 N.E. 424, 425, 62 L.R.A. 751.

The Sporna case, supra, analyzes the others and points out the controlling incidents of each principle. In analyzing the Raymond case, supra, it observes that in that case plaintiff's ankle was injured so that it was likely to turn and fail to support her. On October 9th, nearly four months after her injury, in stepping from a chair to a settee, the ankle gave way and she fell fracturing her leg. The court reasoned that she was not acting from any necessity caused by her previous injury but was acting independently and voluntarily, and as a result of her voluntary conduct she was again injured; that a new and independent cause intervened between the original in-

jury and that which she received on October 9th.

In the Daniels case, supra, plaintiff's intestate was injured by defendant so that his mind was affected to the extent that he took his life. In reversing the trial court, the supreme court observed that so long as he acted with a purpose, even though from a disordered mind, his act should be deemed a new, independent and efficient cause of the death and not the original negligent act.

In the case of Snow v. New York, N. H. & H. R. Co., supra, plaintiff was injured on December 16, 1899, so as to be subject to spells of dizziness, and in 1903 while standing in the sink of her home she was attacked by such a spell and fell breaking her wrist. It was said that it was due to her getting up in the pantry sink to look at a leak and was the result of her voluntary and independent action.

And so in the Sporna case, supra, plaintiff's intestate, a man of fifty-seven years, was injured on July 1, 1929 by defendant's car. His legs were fractured. The casts were taken off on October 8, 1929, and his legs bandaged. He was taken home October 27th. In the middle of November his legs could bear his weight. He then used crutches and in January he was directed to take some exercise out-of-doors, and toward the end of the month he walked around the house some every day discarding his crutches. He was assisted up and down one step in and out of the house. On January 30, 1930, he went to the kitchen and did not return. His wife found him about the middle of the stairway leading to the basement. His legs seemed to have given way and he fell to the basement floor causing his death.

The court in holding defendant not liable for his death observed that decedent, knowing his infirmity, voluntarily and without necessity undertook to walk down steep stairs with no hand rail. The court noted that proximate cause is usually one for the jury. In referring to the cases leaving the question to the jury the court analyzed Hartnett v. Tripp, supra, in which plaintiff had an injury of the femur resulting from defendant's negligence, and had recovered so that with the aid of crutches he could move between his bed and wheel chair, and in getting out of the chair his crutch slipped and he fell back in the chair refracturing the femur at the same place. The court held that it was a jury question observing [231 Mass. 382, 121 N.E. 18]: "In attempting to get out of the chair with the aid of his crutches, he was performing a natural and necessary act, which it could not be ruled was negligent or so distinct from his original injury as to be a separate and independent act." In the Sporna case the court further observed, that it is to be noted that in all the cases there cited which left it to the jury, there was a refracture or reopening of the first wound while being treated for the same and before a cure was effected. But in the Sporna case he was not following his doctor's instructions when going down steps. The court held that as a matter of law defendant's negligence was not the natural, direct or proximate cause of decedent's death, noting that decedent was moving about for no reason connected with his cure, for no purpose incidental to it and at a place where no one can account for his being on either business or pleasure.

Analyzing the cases noted in 9 A.L.R. 255, the first one is Wilder v. General Motorcycle Sales Co., 232 Mass. 305, 122 N.E. 319, 320, where plaintiff was injured sustaining a broken leg. Several months later while descending a flight of stairs her leg gave way and it was found that her leg had again been broken at or near the same place. The court sustained a finding by the jury for plaintiff, observing that: "It could have been found that the second injury was received while the bone was weak and had not recovered its normal strength, owing to the septic condition which developed after the original fracture; and from this the jury also could have found that the second fracture was a natural and proximate result of the first injury. The act of the plaintiff in attempting to walk downstairs was not negligent as matter of law."

The annotator then takes up the Raymond case, supra, and analyzes it. It will be noted that most of the cases are from the Massachusetts Supreme Court. So that

it is not to be supposed that they were intended to be conflicting.

In Vander Velde v. Village of Leroy, 140 Mich. 359, 103 N.W. 812, plaintiff suffered an injury on account of a defective sidewalk, and was recovering with the aid of a crutch which slipped and he was again injured. Recovery was allowed.

In Hoseth v. Preston Mill Co., 49 Wash. 682, 96 P. 423, plaintiff received an injury and three months later he was permitted to go about the hospital using crutches, and as he was ascending the stairs his crutches slipped and he fell rebreaking his leg. The court left the question of proximate cause to the jury, as well as whether she was in the exercise of due and reasonable care.

The annotator includes our case of Thompson v. Louisville & Nashville R. Co., 91 Ala. 496, 8 So. 406, 408, 11 L.R.A. 146. Plaintiff's intestate was injured by defendant. It appeared that while he was under treatment his wife gave him corrosive sublimate which had been left by his physician as a wash. The testimony was conflicting as to whether the original injury was mortal. The court on appeal held that "if the wound was mortal, the person who inflicted it cannot shelter himself under the plea of a new, intervening cause". Louisville & Nashville R. Co. v. Jones, 83 Ala. 376, 3 So. 902; City of Birmingham v. Carlson, 209 Ala. 428, 96 So. 333.

In 20 A.L.R. 524, other cases are annotated and Wagner v. Mittendorf, 232 N.Y. 481, 134 N.E. 539, is reported on page 520. The headnote is that "one negligently breaking another's leg is liable to compensate him for a second break accidentally caused without his negligence, when, under the doctor's orders, he is beginning to get about."

The cases seem to be uniform that a second fall without plaintiff's fault may be found by the jury to be a proximate result of a previous injury, if the second occurred during the process of recovering, while the patient is acting according to the direction or advice of the physician. That was the status of our case of Postal Tel. Cable Co. v. Hulsey, 132 Ala. 444, 31 So. 527.

That is also true when the second injury is due to the negligence of the physician in treating the first trouble. Nall v. Alabama Utilities Co., 224 Ala. 33, 138 So. 411; O'Quinn v. Alston, 213 Ala. 346, 104 So. 653, 39 A.L.R. 1263; Atlantic Pacific Stages v. Yandle, 224 Ala. 481, 140 So. 603.

█ At the time of the second accident, plaintiff in the instant case was pursuing a course which had no relation to the first one, neither with respect to its treatment nor as an incident to it. The second accident apparently did not result from the manner or occasion of her walking. The testimony of the doctor was (hypothesizing the facts to which she testified) that the second accident was probably caused by the condition of her body which resulted from the first accident. If her condition grew worse and weaker after the first accident up to the time of the second, the jury could find that the second accident was probably the proximate result of the first and not the result of her age and condition, which is not attributable to the first accident. 25 C.J.S., Damages, § 146, page 795, note 52, page 796, note 53; Whitman's Fifth Ave. Garage Co. v. Rick's, 211 Ala. 527, 101 So. 53. There was sufficient evidence, therefore, to permit further evidence as to the effect of the second accident.

Attention is called to the fact that in propounding the hypothetical question to Dr. Banks, the court inquired of the witness if the condition would be the probable and *proximate* result of the facts hypothesized.

█ There is no objection to a question propounded to an expert whether a stated result would probably follow from the hypothesized facts, if it calls for expert knowledge as the question here did. But the injection into it of whether it was a proximate result calls for discussion. Proximate cause "is a mixed question of law and fact for the jury" 65 C.J.S., Negligence, § 264, pages 1183–1185. It "is not a question of science or of legal knowledge, but is to be determined as a fact in view of the circumstances, and from a consideration of all the attending facts and circumstances, and in the exercise of practical common sense rather than by the ap-

plication of abstract definitions." 65 C.J.S. Negligence, § 264, page 1187, notes 81–83. It is a juridical question, not one of expert knowledge. It involves many factors not of an expert nature, some are legal and some factual. But the question is not argued on that theory, and the objections and rulings assigned as error (No. 29) include much that is not objectionable.

■■ No question is presented by the record with respect to the failure of plaintiff to use her doctor in Columbus as a witness. Sometimes the failure to produce a witness is subject to comment by opposing counsel and sometimes it is not. But on appeal this Court will not indulge any unfavorable presumptions. See, City of Bessemer v. Clowdus, post, 388, 74 So.2d 259, where the authorities are noted.

■ It is also insisted that the claim for damage resulting from the fall on October 16th is not sufficiently included in the special damages set forth in the complaint. Such a claim in the complaint is necessary to support evidence of it. Lambert v. Jefferson, 251 Ala. 5, 36 So.2d 594.

In the complaint as originally filed the special damages claimed were as follows: "body was badly bruised, her left arm, right side of her head, right hip and right leg were seriously injured". That was in addition to mental anguish and physical pain. On the day of the trial plaintiff amended the complaint by adding to it special damages as follows: "she was injured about her head, limbs and body". It was her left hip which was broken in the fall occurring October 16th.

■ In setting out in the complaint a catalogue of plaintiff's injuries to permit evidence of them, it is not necessary that great particularity be used in a description of them. General terms are usually sufficient. They must give notice to defendant so that he may have an opportunity to prepare to meet the proof which plaintiff may offer. Grasselli Chemical Co. v. Davis, 166 Ala. 471, 52 So. 35; Newton v. Altman, 227 Ala. 465, 150 So. 698; Birmingham Electric Co. v. Mealing, 214 Ala. 597, 108 So.

511; Birmingham Electric Co. v. Chandler, 28 Ala.App. 9, 177 So. 646.

■ The specification here involved is very general, but we think it is sufficient to allow proof of the injury which occurred on October 16th. It is not necessary to allege that further damage resulted on October 16th or even after July 22d, when she was first injured. The injury on October 16th must have proximately resulted from that of July 22d and if so it was within the terms of the complaint setting up her special damages. We think the claim was sufficiently asserted in the complaint to justify the evidence if otherwise proper.

■ Appellants complain that their motion to continue should have been sustained to enable them to perpetuate the testimony of plaintiff before the cause was tried. But that theory does not conform to the purpose of the statute providing for the perpetuation of the testimony of a witness (now also a party). Section 491 et seq., as amended, Title 7, Pocket Part, Code. This statute cannot be used to obtain a discovery; but only for the purpose of securing the testimony of a person against his failure to appear as a witness. If he does appear his perpetuated testimony is not available as evidence. Those principles have recently been settled by this Court. American Life Ins. Co. v. Powell, 259 Ala. 70, 65 So.2d 516. There was no reversible error to deny, on that account, the motion to continue the trial of the case, pretermitting consideration of other reason for such denial.

Appellants also insist that the court erred in his general charge as to the burden of proof in respect to plaintiff's contributory negligence in causing the injury of October 16th, as set out in assignments of error 36, 37, 38 and 39.

In response to the contention, we note that the cases cited above are clear that if plaintiff was negligent and that it was a contributing cause of said second injury she cannot recover for it, since that injury would not then be the proximate result of the first one, but would be insulated from it by her contributory negligence. None of

the cases discuss the question of the burden of proof. But absence of such negligence is often spoken of as a condition to such a claim. 25 C.J.S., Damages, § 20, page 476, notes 84–85.

 The plea of contributory negligence puts in issue the right of recovery for the accident occurring on July 22d. That plea has no relation to the special damages claimed. Plaintiff cannot recover at all if she was negligent proximately contributing to the accident of July 22d. The plea of contributory negligence is not referable to the items of damage involved, but to the cause of action. The burden of proof as to the cause of action is controlled by the issues made in the pleading. Stroup v. Alabama Power Co., 216 Ala. 290(6), 113 So. 18.

But the burden is on plaintiff to prove to the reasonable satisfaction of the jury that she is in fact as well as in law entitled to have and obtain the special damages claimed in the complaint. 25 C.J.S., Damages, § 144, page 789, note 80. We are not now dealing with the question of whether plaintiff has proven the existence of a cause of action, but an item of damage. The accident which is the foundation of the suit may be the proximate result of more than one person's act of negligence. There may be several persons whose negligence proximately contributed to it. One of them may be the plaintiff. If she did so she cannot recover anything of the other person whose negligence was also a contributing factor. But plaintiff's negligence in that regard does not prevent a recovery for the wantonness of defendant.

The right to include an item of damage is dependent upon the same principle in a suit for wantonness as in one for negligence, and the burden in that respect is the same in them. In neither action can plaintiff recover such item of damage as was caused by her own negligence. No plea is appropriate in that connection. But an absence of her negligence causing it is an essential element. Therefore the duty or burden is on plaintiff to acquit herself of negligence in causing it, if she may have it

included in her verdict. The court erred in charging the jury that the burden was on defendant in that respect.

For that error, the judgment should be reversed and the cause remanded.

The foregoing opinion was prepared by FOSTER, Supernumerary Justice of this Court while serving on it at the request of the Chief Justice, under authority of Title 13, section 32, Code, and was adopted by the Court as its opinion.

Reversed and remanded.

LIVINGSTON, C. J., and LAWSON, STAKELY and MERRILL, JJ., concur.